IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT JOHN CAMPBELL,     )
     )
   Petitioner,     )
     )
   v.     )     Civil Action No. 1:24-cv-104 (RDA/IDD)
     )
CHADWICK DOTSON, Director, Virginia )
Department of Corrections,     )
     )
   Respondent.     )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Respondent's Motion to Dismiss (Dkt. 12). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Petition (Dkt. 1), Memorandum in Support (Dkt. 14), and Opposition (Dkt. 19),[1] this Court hereby GRANTS the Motion to Dismiss for the reasons that follow.

### I.    BACKGROUND[2]

On January 18, 2018, Petitioner was indicted for burglary, aggravated malicious wounding, stalking, strangulation, and threat to cause bodily injury to Jennifer Mueller Sanders. Dkt. 1 ¶ 3.

---

[1] No further reply by Respondent was filed.

[2] The background here is drawn from the Petition and the records attached to the Petition in this matter and thus incorporated into the Petition by reference. With the exception of the documents attached to docket entry 1-2, which are referred to by the bates-stamped numbers "A-__," the Court's citations to page numbers in the Petition, briefs, and other filings refer to the CM/ECF designated page numbers.

Petitioner went to trial before a jury in Prince William County from April 15-29, 2019. *Id.* ¶ 4. After the eight-day trial, Petitioner was found guilty of burglary, in violation of Virginia Code § 18.2-91; abduction, in violation of Virginia Code § 18.2- 47; aggravated malicious wounding, in violation of Virginia Code § 18.2-51.2; stalking, in violation of Virginia Code § 18.2-60.3; threat to cause bodily injury, in violation of Viginia Code § 18.2-60; and strangulation, in violation of Virginia Code § 18.2-51.6. *Id.* ¶ 4; Dkt. 14-1. The jury recommended five years of imprisonment for the burglary charge, ten years for the abduction charge, thirty-five years for the aggravated malicious wounding charge, five years for the threats to cause bodily injury charge, five years for the strangulation charge, and twelve months for the stalking charge. Dkt. 1 ¶ 5; Dkt. 14-1.

On September 26, 2019, the trial court held a sentencing hearing and imposed the jury's recommended sentence, with the sentences on each charge to run consecutively to one another for a total sentence of sixty-one years. *Id.* ¶ 6; Dkt. 1-2 at A_1 to A_4.

On November 6, 2019, Petitioner filed a timely notice of appeal and, on March 11, 2020, Petitioner filed a petition for appeal to the Court of Appeals of Virginia raising two issues: (i) whether the trial court erred by admitting evidence of unadjudicated prior bad acts; and (ii) whether the trial court erred by failing to sever the charges of stalking and threat to cause bodily harm from the other three charges. *Id.* ¶ 7. On June 18, 2020, the Court of Appeals denied the petition and, on October 15, 2020, denied Petitioner's demand for a three-judge panel. *Id.* ¶ 8.

The Court of Appeals, in its order denying Petitioner's petition for appeal, stated the facts as follows:

> Appellant and Jennifer Mueller began dating in the summer of 2015. The relationship was turbulent and marked by episodes of violence. In April or May of 2017, Mueller told appellant that they should "move on," but appellant was opposed and continued to text her. Mueller testified that appellant began showing up at places that she visited without warning; she believed that he was following her. Sometime around June 2017, she told him that she was seeing another man and not

2

to communicate with her anymore. On June 5, 2017, Mueller texted appellant, "Stop wasting your time and watching everything I do and start moving on with your life." Later that day, appellant texted Mueller, "Wait to see what will happen to you. You deserve every ounce of what you will get." When Mueller told appellant to "stay away from [her]," he replied, "You'll get yours."

The next day, however, appellant texted Mueller that he loved her and was not "giving up on [her]." Mueller told him to "stop." She responded with a picture of bruises on her leg, stressing, "That's not love." On June 7, 2017, appellant texted Mueller and told her, "We're not done. If you're with another man, I'd kill you. There is no man and if you were, which is cheating, I'd kill you." After Mueller threatened to get a protective order, appellant warned, "Do what you've got to do. It won't stop me if any of this is true." Mueller testified that appellant had previously threatened to "put a bullet through [her] brain" as they were separating. Petrified, she began taking steps to conceal her location from him. On June 10, 2017, Mueller went to her community pool with her two children and her new boyfriend, Smith Sanders. While she was there, appellant texted her and asked if he could drop off a birthday gift at her house. After Mueller declined the offer, she saw appellant's truck drive by the pool slowly two times. The next text messages from appellant asked her if she was with another man. Mueller quickly gathered up her children and returned home. Around dinnertime, Mueller drove her two children to an engineering camp. She told Sanders not to accompany her because she feared that appellant would hurt him if she saw him with her. Mueller walked the children into the camp, and when she returned, she saw appellant's truck parked next to her car. Appellant, who was sitting in the truck, told her that they were going "to talk about this." Mueller asked him to leave her alone and drove away, but appellant followed her. Afraid to drive home where appellant would encounter Sanders, Mueller pulled into a gas station and spoke to appellant from her car in an attempt to "diffuse" the situation. According to Mueller, appellant was "irate" and told her, "We're going to be together." Concealing her phone, Mueller called her friend Amy Farmer so that Farmer could listen to the conversation and call 911 if necessary. Meanwhile, Sanders texted Mueller and told her that he was leaving her house and going home. When Mueller finally revealed to appellant that Farmer had been listening to their conversation, he became "really . . . mad." Appellant "took off" from the gas station, and as he appeared to be driving in the opposite direction from her house, Mueller decided to drive home.

As she did, however, Mueller began to receive nonstop calls from appellant. She testified that she wanted to call Sanders and ask him to return to her house, but the phone would not stop ringing long enough for her to make a call. Appellant called her sixty-six times. Finally, after Mueller got home, she answered appellant's FaceTime call and told him to stop calling. Appellant asked her repeatedly about whether she had been at the pool with another man. Appellant agreed to believe that that she had moved on if she sent a picture as proof. Mueller sent him a photo of Sanders kissing her on the cheek, and the phone went dead. Mueller sat on her back patio and texted Sanders, asking him to return. Without warning, appellant opened the door leading to the patio and confronted her. Mueller quickly texted

3

Sanders, "He's here," and threw the phone down. Appellant approached Mueller, who was still seated, ripped her sunglasses off, "crumpled them up," and threw them on the ground. He took her phone and demanded the password. Mueller complied and sat "frozen" in her chair as he appeared to text. After about a minute, appellant grabbed Mueller, carried her inside the house, and threw her on the family room floor. Straddling her, he started to hit her, striking her left ear forcefully. He then pulled her to her feet, punched her twice in the stomach, and slammed her down again on her right shoulder. Appellant straddled Mueller again and began to choke her. Mueller lost consciousness.

When Officer O'Neal arrived at Mueller's house in response to a 911 call, no one answered the front door initially when he rang the doorbell. After a few minutes, however, a "disoriented" and disheveled Mueller opened the door. She appeared to be in pain. O'Neal noticed that she was holding her ripped shirt together to avoid exposing herself and was wearing no pants. O'Neal asked if he could come inside, and Mueller agreed. She stumbled backwards and collapsed on the stairs next to the entry. O'Neal attempted to question her about what had happened but Mueller could only moan. When O'Neal asked Mueller if someone else was in the house, appellant answered, "I'm right here." O'Neal asked appellant what happened, and appellant told him that "he hit her because she had cheated on him." O'Neal studied appellant carefully, noting that he was "a large individual." The room was flooded with sunlight, and O'Neal could see that appellant was not injured. O'Neal decided to ask appellant to step outside while he waited for backup assistance. Appellant complied, but about four minutes later, he knocked on the door. When Officer O'Neal opened the door, appellant was holding his hand on his head and his arm was covered in blood. Upon appellant moving his hand, O'Neal saw a gash over his right eyebrow that had not been there previously. Appellant told O'Neal that he needed an ambulance. O'Neal noticed that appellant, who had appeared "calm" during his initial interaction with O'Neal, looked "a little disheveled" and was "out of breath." O'Neal found some paper towels for appellant's wound and spoke with him outside. Appellant told O'Neal that, after he confronted Mueller about cheating with another man, she began to hit him. He noted that he "grabbed" her and "kind of threw her away . . . to keep her from hitting him."

Mueller drifted in and out of consciousness as she was transported by ambulance to the hospital. Physician Assistant Venise Atoigue assessed Mueller's injuries in the emergency room. Atoigue noted that Mueller had extensive bruises and was in "a lot of pain." Her chest was bruised and swollen, her abdomen was tender, and she could not move her right arm. She also had bruising behind one ear, a "battle sign" indicating possible head trauma, and difficulty hearing out of the bruised ear. Mueller also had a black eye and bruising on the front of her neck. Further tests determined that her collarbone was broken, and her eardrum was perforated. Mueller required a total of six surgeries to repair the damage to her collarbone and ear.

Appellant testified that Mueller invited him to her home on June 20, 2017. After she showed him a picture depicting her kissing another man, he decided to leave,

4

but she hit him in the back and grabbed his arm. Appellant stated that he pushed her away, but she attacked him a second time by hitting him in the forehead with an object. When she hit him again, he pushed her again, and on this occasion, she fell to the ground. Appellant testified that he was bleeding from the object hitting his forehead, but that the bleeding had stopped by the time Officer O'Neal arrived. According to appellant, he told O'Neal, "She just told me she was cheating on me and attacked me and I pushed her off of me."

Dkt. 1-2 at A_6 to A_10. With respect to Petitioner's specific arguments regarding prior bad acts,

the Court of Appeals summarized the evidence as follows:

At trial, Mueller testified that, during a trip to Hawaii with appellant in November 2015, he became intoxicated and assaulted her, breaking her wrist. He also ripped her clothes and threw them from the balcony. Appellant blamed the episode on excessive drinking, and Mueller forgave him. Appellant moved into Mueller's house in December 2015. In February 2016, Mueller woke up in her bed to find appellant hitting her. Mueller fled to the basement, but appellant found her and "bashed" her head into the floor repeatedly. She sustained two black eyes and a swollen lip from the attack. The following month, in March of 2016, appellant assaulted Mueller again after she spent the night at a girlfriend's house. When Mueller came home, appellant took her car keys and her phone and began to beat her. Appellant threw her into the bar stools in the kitchen before dragging her upstairs and beating her about the legs. Eventually, appellant used a belt, striking Mueller's legs and vagina. Mueller sustained bruises on her hands, feet, legs, and buttocks from the attack. The abuse continued through April of 2016. Mueller testified that her parents visited her that month and that, after appellant went out drinking, she told him not to come to the house. After she realized appellant was still coming, she decided the "safest" course of action was to get in bed with her seven-year-old son. However, when appellant returned home, he found Mueller in her son's bedroom and slapped her and punched her in the face, causing her to bleed. Mueller yelled to her parents to call 911. Paramedics transported Mueller to the hospital for treatment of the injuries to her nose and lip.

In December 2016, Mueller accompanied appellant to Bungalow Alehouse in Woodbridge to watch a football game. She testified that he became angry with her after she spoke to a man and that he left the bar in his car, taking her car keys, purse, wallet, and phone. He returned to the bar in Mueller's new car. After pouring a beer on Mueller's head, he drove off in her car again. Bar personnel saw the incident and called the police. When the police accompanied Mueller to her house, her new car had been vandalized. The garage door was locked, preventing Mueller from entering the house. After spending the night with a friend, Mueller returned to her house the next day and found that her car had been driven into the side of the garage, damaging both the car and the house. She also found that her televisions and grandfather clock had been smashed into pieces.

5

Appellant moved out of the house after this incident, but the couple decided to move forward with the trip to Mexico that they had planned for that month. During the trip, appellant swam up to Mueller in the pool and held her under water for an extended period of time. Frightened, Mueller left the pool and returned to their hotel room. Appellant followed her, and when he reached the room, he threw her clothes outside, ripped her outfit, and took her phone and tossed it into the pool. That night, he poured a drink on Mueller's head as she sat outside a restaurant. Appellant walked away after pouring the drink on her, but he returned and threw Mueller to the ground before hitting her in the face and burning her twice with his cigar.

Although the relationship cooled after the Mexico trip, appellant and Mueller resumed texting each other in late January 2017. In March 2017, appellant visited Mueller at her house after she came home from a work meeting. After commenting that Mueller's shirt was too revealing, appellant ripped it and tore it from Mueller's body. He also broke her phone in half. After that episode, Mueller told appellant that their relationship was over, but appellant continued to text her and to profess his love for her through June 2017.

Dkt. 1-2 at A_11 to A_12.

Petitioner appealed to the Supreme Court of Virginia, and, on June 1, 2021, the Supreme Court of Virginia denied his petition for appeal and, on October 4, 2021, denied a subsequent request for rehearing. *Id.* ¶ 9.

On September 29, 2022, Petitioner filed a state habeas petition that raised one issue: whether his rights to effective assistance of counsel were violated when trial counsel failed to investigate and present character witnesses to the jury. *Id.* ¶ 10. On May 26, 2023, the Circuit Court of Prince William County granted the Director's motion to dismiss and denied the petition in a two-page order. *Id.*; Dkt. 1-2 A_53 to A_54.

On July 7, 2023, Petitioner appealed to the Supreme Court of Virginia asserting the issues raised in his state habeas petition and seeking remand to the state habeas court because the state habeas court failed to make findings of fact and conclusions of law as required by statute. Dkt. 1 ¶ 13. The Director filed a letter seeking remand for the same reason. *Id.* ¶ 14. On October 30, 2023, the Supreme Court of Virginia denied Petitioner's petition and declined to remand the case to the Circuit Court. *Id.* ¶ 15. In so doing, the Supreme Court of Virginia determined that "the

6

Court is of the opinion there is no reversible error in the judgment complained of." Dkt. 1-2 at A_88.

On January 22, 2024, Petitioner filed his Petition. Dkt. 1. On March 19, 2025, this Court directed Respondent to respond to the Petition. Dkt. 10. On May 14, 2025, Respondent filed the pending Motion and his Rule 5 Answer. Dkts. 12, 13. On May 27, 2025, Petitioner filed his Opposition. Dkt. 19. Respondent did not file a reply.

## II.    STANDARD OF REVIEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he or she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473

7

(2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). "The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Where a defendant argues ineffective assistance of counsel, the standard for attorney performance is one of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A judge must determine "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To demonstrate ineffective assistance, a defendant must show both that counsel's conduct was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. The evaluation of the counsel's performance must be "highly deferential." *Umar v. United States*, 161 F. Supp. 3d 366, 375 (E.D. Va. 2015). Such a showing must go beyond establishing that counsel's performance was below average because "effective representation is not synonymous with errorless representation." *Springer v. Collins*, 586 F.2d 329, 332 (4th Cir. 1978) (citation omitted); *see also Strickland*, 466 U.S. at 687-91. Only in "relatively rare situations" will

a § 2255 motion establish that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Tice v. Johnson*, 647 F.3d 87, 102 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 690). With respect to prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### III.    ANALYSIS

As an initial matter, the parties agree that the state circuit court issued a decision on the merits and that the state circuit court decision is the decision to which this Court is intended to defer on habeas review. Dkt. 1 at 16 ¶ 44; Dkt. 14 at 10 ¶ 16; *Richter*, 562 U.S. at 100 (recognizing that Section 2554(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'"). Thus, the Court now turns to the *Strickland* analysis and analyzes each factor in turn.[3]

### A.    Performance

Petitioner argues that trial counsel had deficient performance when trial counsel failed to investigate, interview, or present character witnesses. Dkt. 1 ¶ 52.[4] Petitioner asserts that five

---

[3] Petitioner makes some arguments referencing the state habeas court's failure to hold an evidentiary hearing. But Virginia law does not require an evidentiary hearing. *See* Virginia Code § 8.01-654(B)(4); *Friedline v. Commonwealth*, 265 Va. 273, 277 (2003) (explaining that Virginia Code § 8.01-654(B)(4) "does not require a circuit court to hold an evidentiary hearing in every case in which trial counsel has not submitted an affidavit explaining his conduct at trial"). Moreover, although Virginia law may require the state habeas court to issue findings of fact and conclusions of law, Petitioner does not argue that the failure to provide such explanation is cognizable under Section 2254. Moreover, Supreme Court precedent indicates that it is not. *See Richter*, 562 U.S. at 100 (recognizing that Section 2554(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'").

[4] There is some dispute between the parties regarding whether trial counsel, who submitted no declaration in either the state habeas or these proceedings, failed to interview or investigate

individuals were willing to act as character witnesses. *Id.* ¶ 55. Although Petitioner did not include the declarations in his Petition, the declarations are part of the state record, and the Court has considered them. Dkt. 14-5. Those declarations repeat how long they have known Petitioner, that they have seen Petitioner in the company of Mueller and/or other women, and state "Mr. Campbell's reputation is, among those who know him as [sic] well, for being truthful as well as someone who would be a good caretaker of girlfriends and women, very gentle and respectful as opposed to someone who would harm or abuse them." *Id.* Petitioner suggests that each of the five potential witnesses would have been available and willing to testify at trial, but there was no evidence that this was so before the state habeas court.[5] Petitioner argues that the failure to present these potential character witnesses establishes deficient performance under *Strickland*.

In determining whether counsel's performance was deficient, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Accordingly, "a [habeas] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. When counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. Thus, "strategic choices made after less than complete investigation" are deemed reasonable where "reasonable

---

potential character witnesses. The Court assumes for purposes of the Motion that trial counsel did not interview or investigate the proposed character witnesses.

[5] Petitioner alleged this fact, as he does here, before the state habeas court. But, although Petitioner alleges that his state habeas petition was verified and sworn, the records before this Court do not support that fact. Dkt. 1-2 at A_19 to A_35 (not purporting to be verified or sworn).

professional judgments support the limitation on investigation." *Wiggins v. Smith*, 539 U.S. 510, 512 (2003) (citing *Strickland*, 466 U.S. at 690-91).

Here, trial counsel made a reasoned choice not to pursue the character witnesses such that he did not engage in deficient performance. Each of the five witnesses put forward by Petitioner makes the same claim: that when he was with them, he was not abusive. Dkt. 14-5. But Petitioner admitted to being violent with and around Mueller. Dkt. 15-1 at 169-70, Tr. at 127:15-128:6 (Petitioner testifying that he dumped beer on Mueller and punched two televisions out of frustration with her); Dkt. 15-2 at 1, Tr. at 134:12-18 (conceding that he broker Mueller's phone); *id.* at 2, Tr. at 135:6-20 (recalling text exchange where Petitioner stated "I didn't have a right to put my hands on you" and where Petitioner did not deny Mueller's accusation of ripping her clothes off); *id.* at 13, Tr. at 146 (Petitioner reviewing text exchanges where Mueller accuses him of being abusive and he does not deny it); *id.* at 14, Tr. at 147:5-19 (after Mueller accuses Petitioner in a text of almost killing her, Petitioner responds "Drunk and a long time ago. I regret it. Past."); *id.* at 19-20, Tr. at 152:15-153:7 (Petitioner conceding that he called Mueller a whore, scumbag, slut, and "alcoholic bar rat cheater"); *cf.* Dkt. 16-1 at 85-86, Tr. at 164:21-165:2 (testimony of detective that "At that particular point, I asked him what happened. He explained that he hit her because she had cheated on him."). Further, the evidence presented at trial revealed that Petitioner texted Mueller: "We're not done. If you're with another man, I'd kill you. There is no man and if you were, which was cheating, I'd kill you." Dkt. 1-2 at A_6 to A_7. Any attempt to present character testimony based on the proposed character witnesses never having observed Petitioner being abusive would have opened them up to cross examination on Petitioner's admissions regarding his interactions with Mueller. *See Poole v. Commonwealth*, 176 S.E.2d 917, 919-20 (Va. 1970) ("But the prosecution may introduce evidence of a prior crime to attack a defendant's

11

character if he has attempted to show his good character or has testified in his own behalf and opened the door to impeachment."); *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1998) (counsel not unreasonable for failure to pursue a strategy with the potential to act as a "double-edged sword"); *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) (counsel not unreasonable for failure to pursue a strategy with the potential to act as a "two-edged sword"). Petitioner argues that cross-examining the witnesses would not have "opened the door to any evidence that was not already presented to the jury." Dkt. 19 at 3 ¶ 9. But introducing such evidence would have permitted the prosecution to go over those admissions and incidents again and again in front of the jury. Federal courts consistently recognize that it is a reasonable trial strategy to not emphasize a matter before a jury. *See Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989) (trial counsel routinely chose not to object to the prosecutor's argument because an objection would only emphasize the matter before the jury and does not give rise to a claim under *Strickland*).[6] Thus, trial counsel was not unreasonable in declining to seek out evidence that would open the door to emphasizing the kinds of encounters that occurred between Petitioner and Mueller when other people were not around.

Moreover, trial counsel cannot be faulted for not considering something that Petitioner never raised. As Petitioner alleges: "*If* they had discussed character witnesses, Campbell *would have* told them of numerous friends and colleagues who could testify to his reputation in the community for honesty and gentleness." Dkt. 1 ¶ 46 (emphasis added). By Petitioner's own admission, he never suggested to trial counsel that he had such character witnesses available. *See*

---

[6] Petitioner's argument that "there was no evidence of which his witnesses were unaware" is confusing. Dkt. 19 at 4 ¶ 10. If Petitioner argues that there was no evidence of which his witnesses were unaware, because Petitioner was not violent, then Petitioner's argument fails because the witnesses would have been confronted with Petitioner's admissions via testimony, texts, and other evidence that he was violent, specifically with Mueller. If Petitioner intends to argue that his witnesses were aware of such evidence, then the value of their testimony that he was not violent and/or was a gentle person seems questionable.

12

*Shaw v. Perry*, 2017 WL 626606, at *8 (W.D. Tenn. Feb. 15, 2017) (finding that state court reasonably applied *Strickland* where it held that "[t]rial counsel cannot be faulted for failing to call these character witnesses when the Petitioner never asked him to"); *Ibrahim v. Schweitzer*, 2022 WL 2666729, at *8 (S.D. Ohio July 11, 2022) (denying habeas relief where "[t]he witnesses who testified in post-conviction had not been identified to counsel before trial"); *Trotter v. Dotson*, 2010 WL 3656046, at *8 (E.D. Tenn. Sept. 14, 2010) (denying habeas relief where "counsel testified that Trotter never asked him to speak to witnesses who were not on the State's witness list nor did Trotter provide counsel with the names of witnesses"); *Roberts v. Stirling*, 2023 WL 4204711, at *4 (D.S.C. June 27, 2023) (denying habeas relief where petitioner "never told him about any potential witnesses"); *Harper v. United States*, 2011 WL 13373804, at *38 (S.D. Fla. Aug. 16, 2011) (denying habeas relief where the petitioner "never identified them a potential character witnesses"). Thus, this too, underscores that trial counsel's performance was not deficient.

At bottom, Petitioner's argument is that there was "no reason not to call character witnesses, as it would not have opened the door to any evidence that was not already presented to the jury." Dkt. 19 at 3. But the Supreme Court has rejected the "nothing to lose" standard as not being the appropriate measure of effectiveness under *Strickland*. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). And, indeed, here there was something to lose - trial counsel risked emphasizing evidence that both contradicted Petitioner's testimony and emphasized a capacity for violence with Mueller specifically and particularly when friends were not around.[7] As the Fourth Circuit has recognized, a state court does not err when determining that trial "counsel made a

---

[7] Importantly, this was the focus of the prosecution's case, which asked, "who is he when no one is looking?" Dkt. 17-1 at 107, Tr. at 128:3-8.

reasonable tactical decision not to call character witnesses at the guilt stage of trial." *Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998). Accordingly, Petitioner has not established deficient performance under the first prong of *Strickland*.

### B.   Prejudice

Even assuming *arguendo* that Petitioner has established deficient performance, Petitioner has not established prejudice under the second *Strickland* prong. Petitioner rests his prejudice argument on the theory that the case was about credibility and the character evidence that trial counsel failed to provide (and of which only Petitioner was aware) could have resulted in Petitioner not being found "guilty of at least one, if not all, of the six charges." Dkt. 1 at 21 ¶¶ 57-58. Petitioner's argument in this regard fails.

The Fourth Circuit has held that failure to present character witnesses fails to satisfy the prejudice prong where it does not undermine confidence in the outcome of the trial. *See Blakeney v. Branker*, 314 F. App'x 572, 593-94 (4th Cir. 2009). Indeed, in *Strickland* itself, the Supreme Court held that the kind of general character evidence that Petitioner now offers ("that numerous people who knew respondent thought he was generally a good person"), would not have "changed the conclusion" given the evidence presented. 466 U.S. at 700 (noting such evidence "would have barely altered" the picture presented). Other courts have similarly concluded that the failure to present such general character witnesses is not prejudicial under *Strickland*. *See Bejarano v. Reubart*, 136 F.4th 873, 897 (9th Cir. 2025) (affirming denial of habeas relief based on failure to call character witnesses and noting "it would be wrong to overestimate the positive value of their testimony").

This Court likewise finds that there was no prejudice to Petitioner from the failure to call the character witnesses whom he now identifies (but did not identify at the time). Each of the

14

declarations proffered by Petitioner is generic and each of the declarants would be cross-examined on Petitioner's own statements regarding his violent interactions with Mueller. Dkt. 14-5. Thus, as in *Strickland* and *Bejarano*, Petitioner overstates the impact of such testimony. Like the testimony that Petitioner proffers from his character witnesses, the argument that Petitioner makes to support a finding of prejudice is generic and non-specific. Petitioner does not identify what of his own testimony these witnesses would have bolstered or explain how this would change the calculus on any of the six charges of which he was ultimately found guilty. Indeed, Petitioner does not even assert which charge there is a reasonable probability that Petitioner would not have been found guilty if such testimony had been presented; rather, he asserts the possibility of "one, if not all" having a different outcome. Dkt. 1 at 21 ¶¶ 57-58. Thus, Petitioner's arguments in this regard are "simply too speculative to satisfy the prejudice component for habeas corpus relief under *Strickland*." *Lawhorne v. Murray*, 19 F.3d 11, 1994 WL 65087, at *2 (4th Cir. Mar. 1, 1994).

This is particularly so because the evidence presented by the prosecution was overwhelming. There was testimony from Mueller, text messages between Mueller and Petitioner, Petitioner's testimony regarding prior incidents of violence with and around Mueller, photographs of prior bruises, the extent of Mueller's injuries, and Petitioner's statements to law enforcement. Particularly where the prosecution presented the case as concerning violence behind closed doors when no one else was around, the character witnesses' testimony that he was not violent around *them* adds little to the jurors' consideration. *See Huffinginton*, 140 F.3d at 582 ("Nengel, however, was not an essential witness. The State's other evidence against Huffington was overwhelming." (citing *United States v. Prows*, 118 F.3d 686, 693 (10th Cir. 1997))); *see also Jackson v. Kelly*, 650 F.3d 477, 495 (4th Cir. 2011) (reversing district court's grant of habeas relief, where relief was, in part, based on failure to call character witnesses). In short, Petitioner has not demonstrated

15

a reasonable probability that, but for trial counsel's failure to call these character witnesses, the result on any count would have been different; instead, Petitioner's argument in this regard is disconnected from any particular testimony that the witnesses would have bolstered, the elements of any particular count, and is generally speculative rather than representing a reasonable probability.

*    *    *

For all these reasons, Petitioner fails to demonstrate that the state habeas court made an unreasonable application of clearly established federal law as required in 28 U.S.C. § 2254(d)(1). Although Petitioner purports to bring his claim under Sections 2254(d)(1) and (d)(2), Petitioner does not identify any fact upon which the state habeas court unreasonably relied. Thus, Petitioner's arguments under (d)(1) and (d)(2) are essentially the same and fail for the same reason. *See Crockett v. Clarke*, 35 F.4th 231, 244 (4th Cir. 2022) ("Even though Crockett frames his argument differently, this is essentially the same argument he made under § 2254(d)(1). So, we need not repeat that analysis."). Accordingly, the Court grants Respondents' Motion to Dismiss.

## IV.    CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts; *see also* 28 U.S.C. § 2253(c)(1)(A) (prohibiting an appeal to the respective court of appeals from a final order concerning a habeas corpus petition "[u]nless a circuit justice or judge issues a certificate of appealability"). A certificate of appealability ("COA") will not issue absent "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition

16

should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). For the reasons stated above, the Court has reviewed the record and concluded that Petitioner has not made the requisite showing with regard to these claims. Moreover, the Court concludes that the standard required to issue a COA is not satisfied here. Accordingly, the Court denies a COA and dismisses this Petition.

## V.    CONCLUSION

In sum, Petitioner has failed to establish a plausible claim for relief pursuant to Section 2254. Petitioner has not established that the state habeas court engaged in an unreasonable application of federal law or made an unreasonable determination of facts when it found that Petitioner failed to establish ineffective assistance of counsel under *Strickland*. Accordingly, the Motion to Dismiss (Dkt. 12) is GRANTED; and it is

FURTHER ORDERED that the Petition (Dkt. 1) is DISMISSED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to place this matter among the ended causes.

IT IS SO ORDERED.

Alexandria, Virginia
March 15, 2026

/s/

Rossie D. Alston, Jr.
United States District Judge